IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, ) | CR-12-01870-TUC-CKJ-DTF |
| Plaintiff, ) | |
| vs. ) | **REPORT AND RECOMMENDATION** |
| Elijah John Buchanan, ) | |
| Defendant. ) | |

Pending before the Court is Defendant's Motion to Suppress Evidence. (Doc. 20.) The government responded in opposition. (Doc. 26.) This matter came before the Court for a hearing and a report and recommendation as a result of a referral, pursuant to LRCrim 5.1. Defendant's motion was set for evidentiary hearing and evidence was heard on February 13, 2013. (Doc. 27.) Defendant was present and represented by counsel. This matter was submitted following oral argument at the conclusion of the hearing and taken under advisement.

Defendant's motion seeks to suppress evidence on the grounds that he was unlawfully arrested. Having now considered the matter, the Magistrate Judge recommends that the District Court, after its independent review, deny Defendant's Motion to Suppress Evidence.

**FACTUAL FINDINGS**

On August 12, 2012, at 3:13 p.m., a magnetic sensor on Rancho Seco Road, near Green Valley, Arizona, activated and Border Patrol agents in the area responded. (RT 2/13/13 at 13-14.)[1] Sensors are used to detect the presence of vehicles, and Border Patrol agents respond by going out and checking the individual sensor. (*Id.* at 14-15.) Rancho Seco Road is part of a series of semi-improved dirt roads and tracks leading through the desert, commonly used by hunters and ranchers. (*Id.* at 11.) On average, the sensors are only activated a few times on any given day. (*Id.* at 15.) Because of the poor conditions of the roads, the vehicles that do drive through the area tend to keep speeds at around 15 miles per hour, as that is the lawful speed for an unmarked road. (*Id.* at 24-25.) Ranchers and hunters may drive even slower than that because they often look for signs of animal tracks, as well as for ideal places to hunt. (*Id.* at 16.) However, because these back roads also allow a vehicle to circumvent the nearby border patrol checkpoint, the route also is frequented by drug smugglers. (*Id.* at 11.)

Agent Thomas Collins first responded to the activated sensor and, upon arrival, found signs of fresh tire tracks. (*Id.* at 15.) While Agent Collins followed the tracks, a second sensor was activated further north on the road. (*Id.* at 16.) In Agent Collins's opinion, the vehicle was traveling faster than what he would expect from a hunter, and it also was driving in a direction consistent with circumventing the border patrol checkpoint. (*Id.* at 16-17.) Agent Collins continued to follow the tire signs and proceeded to call for the assistance of other agents. (*Id.* at 17.)

Agent Paul Wilcox responded to Agent Collins's request for assistance and drove north on Batamote Road in his marked agency vehicle. (*Id.* at 23, 25.) Agent Wilcox identified a vehicle – a gray pickup truck with two doors and an extended cab – traveling

---

[1] "RT" refers to the Reporter's Transcript of the February 13, 2013 evidentiary hearing. (Doc. 31.)

- 2 -

south on the same road at an average speed. (*Id*. at 24-25.) Because the dirt road is so narrow, Agent Wilcox slowed his vehicle to a stop to ensure there was enough space for the truck to pass. (*Id*. at 25.) As the truck approached, Agent Wilcox noticed there were two people inside. (*Id*.) Agent Wilcox waved to the men, however, neither acknowledged Agent Wilcox's presence as the vehicles slowly passed. (*Id*.) This was suspicious to Agent Wilcox, as most hunters and ranchers he encounters in the area will stop and talk with him or, at the least, otherwise acknowledge his presence. (*Id*. at 25-26.)

After the truck passed, Agent Wilcox began to make a U-turn and noticed that the gray truck abruptly picked up speed, accelerating to 35 or 40 miles per hour. (*Id*. at 27.) This left the agent with the impression that the occupants were trying to flee his presence. (*Id*.) At 4:10 p.m., Agent Wilcox radioed other agents with a description of the gray truck and that it was fleeing the scene. (*Id*. at 27-28, 81.) He also noted the vehicle had two occupants. (*Id*. at 34-35.) He proceeded to follow the truck, activating both his sirens and lights while attempting to keep up with the truck in the cloud of dust it had created. (*Id*. at 28-29.) Unable to follow the truck at a safe speed, Agent Wilcox lost visual of the vehicle and began to follow its tire signs. (*Id*. at 29.)

Agent Ryan Ellis heard the report about the gray truck. (*Id*. at 38-39.) At 4:36 p.m., a truck matching the description of the fleeing vehicle popped out of the desert, making a left turn in front of Agent Ellis's vehicle onto a four-wheel drive gas line road. (*Id*. at 40, 81.) Agent Ellis could see two occupants in the truck in front of him and he made eye contact with the passenger who appeared surprised to see him. (*Id*. at 41.) The gray truck was traveling at approximately 40 miles per hour as Agent Ellis attempted to maintain a visual on the vehicle. (*Id*. at 42.) Because of the large amount of dust the truck had created, Agent Ellis lost sight of the vehicle as he was not able to keep up with it at a safe speed. (*Id*. at 42-43.) Agent Ellis stopped and exited his vehicle to search the ground for tire tracks. (*Id*. at 43.) Agent Ellis saw that the gray truck had turned onto a road which leads to a nearby neighborhood. (*Id*.) He followed this road, finding the gray truck once again. (*Id*. at 44.)

1  As Agent Ellis approached, Agent Paul Brown was already there, giving commands to the
2  driver to turn off the truck and exit the vehicle. (*Id*. at 45.)
3        At 4:41 p.m., Agent Brown had seen the gray truck driving towards him on a hunters'
4  access road. (*Id*. at 59-60, 81.) Both vehicles stopped, facing each other, allowing Agent
5  Brown to observe that the only occupant was a driver. (*Id*. at 61.) The passenger, observed
6  earlier by Agent Wilcox and Agent Ellis, appeared to be missing in an area of the desert
7  where someone would not have reason to exit a vehicle. (*Id.* at 66-67.) The gray truck
8  inched forward, angled toward the driver's side of Agent Brown's unmarked patrol vehicle.
9  (*Id*. at 61-62.) Agent Brown, who was in official uniform, exited his vehicle, drew his
10 weapon and began giving orders to the driver to show his hands. (*Id*. at 62.) The driver was
11 noncompliant with this order, responding by questioning Agent Brown's authority. (*Id*. at
12 62-63.) Agent Brown continued to order the driver to show his hands and to put the vehicle
13 in park. (*Id*. at 63.) The driver remained noncompliant, fidgeting in the truck and yelling at
14 Agent Brown. (*Id*.) Agent Brown then reached into the truck to gain control of the driver
15 and to make sure the vehicle was in park. (*Id*.) The driver immediately started resisting the
16 agent, screaming and attempting to record the interaction with his cell phone. (*Id*. at 64-66.)
17       Together, Agent Ellis and Agent Brown struggled with the noncompliant driver. (*Id*.
18 at 63.) The agents tried to remove the driver from the vehicle to secure his hands behind his
19 back with handcuffs. (*Id*. at 64.) The driver remained noncompliant, curling into a ball in
20 the driver's seat. (*Id*.) When the agents removed the driver, he continued to resist by tucking
21 his arms beneath him on the ground, but they were finally able to handcuff him. (*Id*.)

## **DISCUSSION**

23       Defendant seeks to suppress all evidence seized by government agents as a result of
24 his unlawful stop, detention and arrest. The government responds that the stop and detention

- 4 -

1  were supported by reasonable suspicion and there was probable cause to arrest Defendant.[2]

2          <u>Reasonable Suspicion</u>

3  The Fourth Amendment's prohibition of unreasonable searches and seizures extends to the brief investigatory stop of a vehicle. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). Therefore, an officer must have a "reasonable suspicion" that criminal activity may be afoot to stop a motorist. *United States v. Diaz-Juarez*, 299 F.3d 1138, 1141 (9th Cir. 2002). When the Court makes reasonable-suspicion determinations, it must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for his or her suspicions about criminal activity. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

An officer may draw inferences from, and deductions about, the cumulative information based on experience and specialized training, which "might well elude an untrained person." *United States v. Cortez*, 449 U.S. 411, 418 (1981); *see also Ornelas v. United States*, 517 U.S. 690, 699 (1996) (reviewing court must give "due weight" to factual inferences drawn by resident judges and local law enforcement officers). An investigatory stop must be based on facts, not the "mere subjective impressions of a particular officer," *United States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989), and the inferences drawn by the officer must be objective and reasonable, *Cortez*, 449 U.S. at 418. Under the collective knowledge doctrine, the aggregated knowledge of all the officers involved in a criminal investigation is evaluated to determine whether there was reasonable suspicion. *United States v. Sutton*, 794 F.2d 1415, 1426 (9th Cir. 1986).

---

[2] In its response brief, the government stated that agents used a K9 to locate several bundles of marijuana in the open desert just over 100 yards from where Defendant's truck was stopped. The government also asserted the truck driven by Defendant was reported stolen. Therefore, the government argued Defendant did not have an expectation of privacy in the area in which the marijuana was found or in the vehicle. At the hearing the government did not offer any evidence to support these assertions. (*See* RT 2/13/13 at 90-93.) Therefore, the Court does not address these arguments.

In the context of stops made near a border, the Supreme Court has identified a non-exclusive set of factors that may be considered in determining whether reasonable suspicion exists: (1) characteristics of the area in which the car is traveling; (2) proximity to the border; (3) usual traffic patterns on the road; (4) prior experience with alien traffic; (5) recent illegal border crossings in the area; (6) erratic or evasive driving behavior; (7) vehicle characteristics; and (8) the behavior or appearance of the driver. *Brignoni-Ponce*, 422 U.S. at 884-85. Additionally, the Court has recognized that attempts to evade border patrol agents can be used to justify reasonable suspicion. *Arvizu*, 534 U.S. at 277. Further, a court may consider a person's "presence in an area of heavy narcotics trafficking . . . [and] his unprovoked flight upon noticing the police" as factors in determining the presence of reasonable suspicion. *Illinois v. Wardlow,* 528 U.S. 119, 124 (2000).

Whether an investigatory stop becomes elevated to an arrest depends upon the totality of the circumstances. *United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir. 1990). "There has been an arrest if, under the circumstances, a reasonable person would conclude that he was not free to leave after brief questioning." *Id*. In addition, "[w]hether the police physically restrict the suspect's liberty is an important factor" for the court to consider when determining the level of intrusion created by the stop. *Washington v. Lambert*, 98 F.3d 1181, 1189 (9th Cir. 1996). However, police may take reasonable actions to reduce the threat of physical harm, as well as take action to determine whether a person is armed. *United States v. Alvarez*, 899 F.2d 833, 838 (9th Cir. 1990) (citing *United States v. Hensley*, 469 U.S. 221, 235 (1985)). The fact that officers brandish weapons and order a suspect to stop, show his hands, and exit the vehicle is not dispositive of whether the stop has turned into an arrest. *Id.* Further, handcuffing a person does not automatically elevate an investigatory stop to an arrest. *United States v. Miles,* 247 F.3d 1009, 1012 (9th Cir. 2001) (court found that the officers conducted an investigatory stop, not an arrest, when holding the defendant at gunpoint and handcuffing him). "[T]he use of especially intrusive means of effecting a stop [is only allowable] in special circumstances, such as . . . where the suspect is uncooperative

- 6 -

or takes action at the scene that raises a reasonable possibility of danger or flight. *Washington*, 98 F.3d at 1189.

Based on the Border Patrol Agents' collective knowledge there was reasonable suspicion to stop Defendant's truck. The agents' observations were grounded in objectively identifiable facts, and the totality of the circumstances made clear that the agents had reasonable suspicion. First, Defendant was traveling in an area frequented by drug traffickers. (RT 2/13/13 at 11.) Defendant's behavior – driving at a high speed on unimproved roads and failure to acknowledge Agent Wilcox's presence – was inconsistent with that of the local hunters and ranchers with whom the agents are familiar. (*Id.* at 16.) Rather, Defendant's behavior was consistent with that of someone whose only purpose in using that route was to circumvent the border patrol checkpoint. (*Id.* at 16-17.)

Second, Defendant fled from Agent Wilcox. (*Id.* at 27.) Agent Wilcox pursued Defendant in a marked vehicle and used both his sirens and lights to indicate that Defendant needed to stop the vehicle. (*Id.* at 28-29.) Defendant's failure to stop and his acceleration to nearly three times the lawful speed limit suggest suspicious behavior. (*Id.* at 27.) Defendant also fled from Agent Ellis, despite Defendant's passenger recognizing that they were being followed by a Border Patrol Agent. (*Id.* at 41.)

The agents' reasonable suspicion was bolstered by the disappearance of Defendant's passenger. Agent Brown was reasonable in finding this suspicious, as the area is not one where Defendant could plausibly explain the sudden absence of his passenger. (*Id.* at 67.) Further, the passenger's unknown whereabouts posed a potential threat to officer safety.

Defendant's noncompliance with Agent Brown's order to put the truck in park, and his two prior flights from other agents justified the decision to stop the vehicle. Defendant's noncompliance with the agents' orders to show his hands further demonstrated reasonable suspicion to stop the vehicle. (*Id.* at 62.) Once Defendant finally brought the vehicle to a complete stop, he continued to disregard the agents' orders. The agents were justified in finding this behavior suspicious because they were unaware of what Defendant had in his

hands. (*Id.* at 64-66.) Without seeing Defendant's hands, the agents could not be sure whether the object he was holding was a weapon. Not only did Defendant refuse to show his hands, but he continued to resist both Agent Brown and Agent Ellis, forcing them to place him on the ground, untuck his arms, and handcuff him. (*Id.* at 64.)

Defendant's presence and dangerous behavior in an area frequented by drug traffickers, his two flights from Border Patrol Agents, his passenger's unexplainable disappearance, and his continuous noncompliance with agent orders are all objectively identifiable facts that gave the agents sufficient reasonable suspicion with which to stop the vehicle.

Removing Defendant from the vehicle and handcuffing him did not elevate the stop to an arrest. The agents had valid concerns for officer safety because Defendant was noncompliant, inched his truck towards Agent Brown, and fidgeted with his hands in his lap out of their sight, and the passenger of the vehicle was missing. Therefore, drawing their weapons was not an unreasonable action, especially because they did not know if Defendant was armed. The agents took reasonable measures to ensure their safety by removing Defendant from his vehicle and handcuffing him. The agents did not exceed the scope of an investigatory stop.

Probable Cause

Even if Defendant could successfully argue that he was arrested when the agents removed him from his vehicle and handcuffed him, the agents had sufficient probable cause to make the warrantless arrest.

It is a crime to interfere with certain officers or employees of the United States. 18 U.S.C. § 111. This includes "any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties." 18 U.S.C. § 1114. Specifically, this statute applies to someone who "forcibly assaults, *resists*, opposes, *impedes*, intimidates, or interferes with any person

1 designated in section 1114 . . . while engaged in . . . official duties." 18 U.S.C. § 111
2 (emphasis added).

3       A warrantless arrest must be supported by probable cause. *Del Vizo*, 918 F.2d at 825.
4 Probable cause exists if, "at the time the arrest is made, 'the facts and circumstances within
5 [the officers'] knowledge and of which they had reasonably trustworthy information were
6 sufficient to warrant a prudent man in believing that the petitioner had committed or was
7 committing an offense.'" *Bailey v. Newland*, 263 F.3d 1022, 1031 (9th Cir. 2001) (quoting
8 *Beck v. Ohio*, 379 U.S. 89, 91 (1964)); *see also United States v. Carranza*, 289 F.3d 634, 640
9 (9th Cir. 2002). Probable cause is to be determined based upon the objective facts available
10 for consideration by the officers participating in the arrest. *United States v. Bernard*, 623
11 F.2d 551, 560-61 (9th Cir. 1980). If an officer has probable cause to believe that an
12 individual has committed even a minor criminal offense, he may, without violating the
13 Fourth Amendment, arrest the offender. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354
14 (2001). When the officers involved are working in close concert with each other, "the
15 knowledge of one officer is the knowledge of all . . . in the operation of an investigative or
16 police agency the collective knowledge and the available objective facts are the criteria to
17 be used in assessing probable cause." *Bernard*, 623 F.2d at 561; *United States v. Sutton*, 794
18 F.2d 1415 (9th Cir. 1986).

19       In the present case, the agents had sufficient probable cause to warrant an arrest.
20 Defendant interfered with the Border Patrol Agents' duties several times, violating 18 U.S.C.
21 § 111 and giving the agents probable cause to make an arrest. Defendant initially fled from
22 Agent Wilcox who pursued the truck with his lights and siren activated. Defendant then
23 refused to follow Agent Brown's directions to stop, exit the vehicle, and show his hands. (*Id.*
24 at 63.) These actions impeded the agents' ability to safely conduct their lawful stop. When
25 Agent Brown attempted to gain control of the noncompliant Defendant, he noted that
26 Defendant "immediately just started resisting." (*Id.* at 63.) Defendant further resisted the
27 agents by refusing to bring his arms in front of his body so that the agents could handcuff
28

- 9 -

him.  (*Id.* at 64.)

Because Defendant repeatedly violated 18 U.S.C. § 111 by resisting and impeding the agents' ability to do their jobs, the agents had sufficient probable cause with which to make an arrest.

## **RECOMMENDATION**

In view of the foregoing, it is recommended that, after its independent review of the record, the District Court DENY Defendant's Motion to Suppress (Doc. 20).  Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections within 14 days of being served with a copy of this Report and Recommendation.  A party may respond to the other party's objections within fourteen days.  No reply brief shall be filed on objections unless leave is granted by the district court.  If objections are not timely filed, they may be deemed waived.

DATED this 7th day of March, 2013.

D. Thomas Ferraro
United States Magistrate Judge